# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JAMES SMORTO,**

        **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　**Case No.  6:04-cv-315-Orl-31JGG**

**3DI TECHNOLOGIES, INC.,**
**PRUDENTIAL INSURANCE COMPANY**
**OF AMERICA,**

        **Defendants.**

_____

# ORDER

      This matter comes before the Court on the Defendant, Prudential Insurance Company of America's ("Prudential") Motion for Summary Judgment (Doc. 29) and the Plaintiff, James Smorto's ("Smorto") Memorandum in Opposition thereto (Doc. 36).  Smorto brought this action under section 1132(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*. ("ERISA"), claiming that Prudential's denial of his long term disability benefits was unreasonable.  For the reasons stated herein, Prudential's Motion is granted.

## I.　　Background

     A. The Parties

      Smorto is a resident of Volusia County, Florida.  He began working for 3DI Technologies, Inc.,[1] ("3DI") on April 1, 1999, as a photo lab technician.[2]  Smorto was a qualified participant in

_____

    [1] 3DI Technologies, Inc. is a Maryland corporation licensed to do business in Florida.

    [2] The record indicates that Smorto's job description was most closely matched by the job description for "photographic hand developers," who expose photographic film in a series of chemical and water baths to produce prints.  That work is classified as light work that may include the following

an employee pension plan (the "Plan") sponsored by 3DI and issued by Prudential.  The Plan is a

qualified employees' welfare plan under the Internal Revenue Code, and an employee pension plan

under ERISA.

B. History

*1) Smorto's medical history, initial filing, and Prudential's first denial*

On February 28, 2000,[3] Smorto reported to the North Florida / South Georgia Veterans

Health System's ("VHS") psychologist that he was suffering from chronic fatigue and irritability,

and that he had difficulty concentrating.  (Doc. 32 at 0188).  Smorto also revealed that he did not

want to go to work and that he did not like his job.  (*Id.*).  A March 7, 2000, VHS report indicates

that a lab work-up was being completed for chronic fatigue syndrome, and also noted that Smorto

had reported symptoms including headaches and muscle and knee pain and that his symptoms

were interfering with his work.  (*Id*. at 0213).  As of April 14, 2000, Smorto had been prescribed

---

requirements: to lift/carry up to 20 pounds occasionally, and to lift/carry ten pounds frequently; to
stand between four and eight hours; to walk between zero and four hours; to stoop, finger, reach, or
handle objects; and near visual acuity, depth perception, accommodation and color vision.  (Doc. 32
at 0078).  The Court notes here that  Prudential filed supporting documentation at Doc. 32, each page
of which was Bates-stamped, giving each page a four-digit page number.  The Court will refer to those
pages by their Bates-stamp four-digit number.

[3] In Smorto's Memorandum, he begins his history on February 28, 2000, but his reasons for
doing so are unclear.  The record contains medical documents dating as far back as a report issued
August 8, 1997, which report states that Smorto frequently evidenced somatization and made
complaints of chronic fatigue and sleeping difficulties.  (Doc. 32 at 0235) (*see* definition of
"somatization" *infra* at n.5).  The record also repeatedly documents Smorto's complaints of bilateral
knee pain prior to February 28, 2000.  (*See id*. at 0231 (report dated February 17, 1998); *id*. at 0228
(report dated January 11, 1999); *id*. at 0197 (report dated January 22, 1999, noting no evidence of
fracture, dislocation or obvious bony abnormalities in either knee); *id*. at 0226 (report dated February
5, 1999).

Prozac for depression, and was being evaluated by the VHS for fibromyalgia.[4]  (*Id*. at 0179, 0207).

On June 8, 2000, Smorto complained to the VHS of flare-ups with joint and muscle pain, (*id*. at 0174), and on July 25, 2000, he reported continued headaches, (*id*. at R0172).  During a neurologic examination on August 7, 2000, the VHS found that Smorto demonstrated give way weakness,[5] as well as tandem gait while complaining of dizziness.  (*Id*. at 0766).  Then, on August 10, 2000, with Smorto continuing to report consistent muscle pain in his back and neck, problems concentrating, depression, and an inability to stand or walk any distance due to fatigue and pain, (*id*. at 0161-0163), the VHS found that no diagnosis could definitely be made, and noted that he would be better served at that time not to work until a definitive diagnosis could be determined.[6]  (*Id*. at 0163).

Smorto last worked for 3DI on August 14, 2000, on which date he filed his initial statement with Prudential, seeking both short term disability ("STD") and long term disability ("LTD") benefits under the Plan, and alleging that he was unable to perform the functions of his job due to a disability marked by weakness, pain, fatigue, depression and insomnia.  (*Id*. at 0254;

---

[4] Fibromyalgia is one of a group of disorders affecting the soft tissue, such as muscles or connective tissue, characterized by pain, tenderness and stiffness of the muscles and associated connective tissue structures.  Medline Plus, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

[5] Give way weakness is a sign of non-organic behavior, and may represent either somatization or malingering.  (Doc. 32 at 0089).  An "organic" issue is one that relates to the body or structure of an organism.  Medline Plus, *supra* at n.4.  Thus, non-organic behavior is behavior unrelated to a physical condition.  Somatization is the conversion of an emotional, mental or psychosocial problem to a physical complaint.  *Id*.  Malingering is pretending or exaggerating an incapacity or illness so as to avoid duty or work.  *Id*.

[6] The VHS also determined that Smorto's cervical and lumbar spine appeared radiographically within normal limits.  (Doc. 32 at 0168-0169).

Case 6:04-cv-00315-GAP-JGG   Document 37   Filed 05/23/05   Page 4 of 22 PageID 193


*see also* Doc. 29 at 3).  Prudential initially approved Smorto's application for STD benefits, effective August 28, 2000, and requested medical information.  (Doc. 29 at 3).

Smorto again reported to the VHS on September 7, 2000, with generalized weakness, fatigue, dizziness, generalized pains in his upper and lower extremities, neck and lower back, and an intermittent shooting pain in his extremities.  (*Id*. at 0155).  At that time, Smorto indicated that these problems had progressed over the previous six months, and that he had concerns about being unable to work due to those problems.  (*Id*.).  He also reported momentary disorientation, poor sleep patterns, jerking and twitching of his extremities during sleep, and occasional tremors.  (*Id*.).  That exam noted that he did not show any fatigue with repetitive exertion, he needed much encouragement to give maximal effort, and he initially displayed much give way weakness.  (*Id*. at 0157).  Further, he was able to perform tandem gait while complaining of dizziness.  (*Id*.).

Smorto underwent an independent medical examination on October 26, 2000, conducted by Dr. Walter Black.  (*Id*. at 0124-0128).  Dr. Black noted that Smorto "carried" the following diagnoses: asthma,[7] GERD,[8] degenerative joint disease of the knees, insomnia,

---

[7] Asthma is a condition, often with an allergic origin, marked by continuous or labored breathing, and accompanied by wheezing, a sense of constriction in the chest, and often by attacks of gasping or coughing.  Medline Plus, *supra* at n.4.

[8] GERD (Gastroesophageal Reflux Disease) is a chronic condition characterized by periodic episodes of a backward flow of the gastric contents into the esophagus resulting from improper functioning of a sphincter at the lower end of the esophagus, usually accompanied by heartburn, and which may result in tissue changes in the esophagus.  Medline Plus, *supra* at n.4.

hypercholesterolemia,[9] fibromyalgia, depression, dyshidrotic eczema,[10] malaise, and diarrhea.[11]

(*Id*. at 0124).  Dr. Black determined that the

> unifying concept was allergic.  A likely scenario is that his asthma and rhinorrhea
> are allergy induced.  His GERD problems could be a result of esophageal irritation
> related to post-nasal drainage. This cold also is a contributing factor to his problems
> with diarrhea. Problems breathing at night lead to sleep disruption and may well be
> a contributing factor to his depression and intermittent problems with memory
> primarily from a fatigue factor. I also believe his diagnosis of fibromyalgia is more
> likely due to the myositis type discomfort associated with chronic sleep
> disruption.[12] The problem with his knees is a degenerative problem. His cruciates
> are loose in both knees.[13]  This problem requires address from an orthopedist.

(*Id*. at 0127).  Dr. Black recommended that: Smorto be evaluated for allergies, sleep disturbances

and for his knees; Smorto be treated for allergies; and Smorto's temporary disability be extended

pending allergy and sleep disturbance evaluations.  (*Id*. at 0128).

Smorto underwent a sleep examination on December 9, 2000.  (*Id*. at 0750).  The

conducting physician, Dr. Wahba, found that Smorto had mild obstructive sleep apnea, with no

---

[9] Hypercholesterolemia is the presence of excess cholesterol in the blood.  Medline Plus, *supra* at n.4.

[10] Dyshidrotic eczema is characterized by the development of vesicular eruptions on the palms and soles, especially along the sides and between the digits.  It is accompanied by pruritus, which is a burning sensation, and hyperhidrosis, which is excessive perspiration.  It lasts only a few weeks. Dept. of Medical Oncology, University of Newcastle Upon Tyne, *Online Medical Dictionary* (2003), *at* http://cancerweb.ncl.ac.uk/omd/.

[11] Dr. Black also noted that Smorto had experienced problems with balancing since March of 2000.  (Doc. 32 at 0141).

[12] Myositis is muscular discomfort or pain, from an infection or an unknown cause.  Medline Plus, *supra* at n.4.

[13] The cruciates are ligaments in the knee joint which cross each other from the thigh bone to the shin bone.  Medline Plus, *supra* at n.4.

cardiac arrhythmia, abnormal movement or oxygen desaturation.[14]  (*Id*.).  Then, on December 11,

2000, the VHS found, pursuant to an MRI of Smorto's brain, that he had increased signal

intensities in the right superior cerebellar cortex, possibly representing infarcts.[15]  (*Id*. at 0738).

An MRI of Smorto's spine revealed that other than left parocentral spurring at the C5-6 level, the

cervical spine was unremarkable in appearance.  (*Id*.).

After reviewing Smorto's medical documentation, on December 11, 2000 Prudential

terminated his STD benefits effective November 18, 2000, and denied his claim for LTD benefits

(the "First Denial").  (Doc. 29 at 3; Doc. 32 at 0001-0002).  The First Denial noted the review of a

variety of medical records, found that the furnished test results had all been within normal limits,

and concluded that Smorto did not meet the Plan's definition of "disability" for the purpose of

LTD benefits.  (*Id*.).  Smorto appealed the First Denial on March 30, 2001, (*id*. at 0687-0688,

0119), and submitted additional medical records, (*id*. at 0119).

*2) Reconsideration and Prudential's second denial*

On May 27, 2001, the VHS indicated that an MRI showed several small lesions in

Smorto's cerebellum, possibly representing strokes.  (*Id*. at 0680).  However, there was no

indication that these lesions caused Smorto's symptoms.  On May 29, 2001, the VHS noted that

Smorto used crutches for assistance in ambulation secondary to extreme fatigue, balance problems

---

[14] Sleep apnea is brief periods of recurrent cessation of breathing during sleep that is caused especially by obstruction of the airway or a disturbance in the brain's respiratory center and is associated especially with excessive daytime sleepiness.  Medline Plus, *supra* at n.4.

[15] An infarct is an area marked by the death of a portion of tissue, resulting from an obstruction of local circulation by either a blood clot attached in a blood vessel or an abnormal particle circulating in the blood.  Medline Plus, *supra* at n.4.

and weakness.  (*Id*. at 0627).  In addition, that report noted that Smorto demonstrated marked give

way weakness in all four extremeties secondary to pain, no true muscular weakness was noted, and

he was able to obtain full strength with much coaching, but was reluctant to give full effort

secondary to pain. (*Id*.)  Finally, that report indicated that although Smorto had no neurologic

disease to explain his symptoms, the attending physicians felt that his central problems were

depression, sleep difficulties, and pain syndrome in his muscles and lower back, possibly

representing fibromyalgia.  (*Id*.).

After reviewing Smorto's request for reconsideration, on August 27, 2001 Prudential

determined that Smorto was eligible for benefits for the period from November 19, 2000 through

May 31, 2001, but terminated his claim effective June 1, 2001 (the "Second Denial).  (*Id*. at 0016-

0018, 0019).  Prudential noted that although Smorto was limited by pain, all tests and

examinations revealed normal findings, and that no impairments or combination of impairments

existed that prevented him from performing the duties of his job as a photo lab technician.  (*Id*. at

0017).

### 3) Smorto's appeal and Prudential's third denial

Smorto filed another appeal with Prudential on October 23, 2001, contending that the

medical evidence established that he suffered from a number of symptoms, including muscle pain,

headaches, difficulty balancing, numbness and tingling, and secondary symptoms of fatigue and

depression resulting from fibromyalgia.  (*Id*. at 0607-0608).[16]

---

[16] The VHS appears to have diagnosed Smorto with fibromyalgia at least as early as February, 2001, (Doc. 32 at 0699), if not in April, 2000, (*id*. at 0474 (noting that Smorto was being "followed" for fibromyalgia)).

Dr. Stephen Gerson performed an independent psychiatric review of Smorto's file on December 20, 2001.  (*Id*. at 0093-0106).  Dr. Gerson reviewed a number of documents.  First, he reviewed a report from Dr. Elek J. Ludvigh regarding psychological test results,[17] which noted that Smorto was diagnosed with bi-polar disorder with "moderate rapid cycling without full episode recovery;"[18] dysthymia primary type, characterized by chronic mildly depressed mood caused by medical problems, decreased employment, and the inability to engage in physical activities;[19] and frequent panic attacks.  (*Id*. at 0093-0094).  Next, Dr. Gerson reviewed medical records from the VHS for the period from October 19, 1996 through September 17, 2000, (*id*. at 0097-0099), as well as case notes from claims manager Danielle Crescnzi, (*id*. at 0099-0101).  Although Smorto had reported symptoms of fibromyalgia, muscle and joint pain, difficulty concentrating and depression, and despite the fact that Smorto had been out of work since August 21, 2000, Dr. Gerson found that there were no indications in the record that Smorto suffered from functional impairment due to fibromyalgia, and noted that there was no medical evidence to support a disability.  (*Id*. at 0101).

Dr. Gerson also reviewed a report from Dr. Walter Black, dated October 25, 2000, as well as medical and psychiatric notes from February 5, 2000 through June 13, 2001, which revealed the

---

[17] Dr. Ludvigh is a consulting and clinical psychologist.  (Doc. 32 at 0616-0621).  His report is undated.  (*Id*.).

[18] Bi-polar disorder is a mood disorder characterized by alternating episodes of depression and mania, or by episodes of depression alternating with mild nonpsychotic excitement.  Medline Plus, *supra* at n.4.

[19] Dysthymia is a mood disorder characterized by chronic, mildly depressed or irritable mood, often accompanied by other symptoms such as eating and sleeping disturbances, fatigue, and poor self-esteem.  Medline Plus, *supra* at n.4.

following: Smorto had been diagnosed with depression, (*id*. at 0102); an MRI of Smorto's spine performed on March 22, 2001 indicated posterior disc material at L4-L5, and L5-S1, a left paracentral disc protrusion with posterior displacement of the descending L5 nerve root, and a left paracentral disc protrusion at L5-S1, (*id*.);[20] a record from Daytona Mental Health Treatment Center noted constant pain as one of Smorto's main issues, (*id*.); and the VHS prescribed several medicines for Smorto's pain and sleep problems, (*id*. at 104).[21]

Dr. Gerson then made a number of findings from a psychiatric perspective regarding Smorto: he had difficulties in long-standing interpersonal relationships, had been socially isolated, had limited psychological insight, and suffered from mild to moderate dysthymia; he had no documented problems with intellectual impairment, concentration difficulties, attention difficulties, or severe memory impairment; his fatigue did not appear psychologically disabling; he was not suicidal, psychotic, or homicidal; he was intellectually and emotionally functional; his cognitive functioning, attention and concentration seemed adequate for his position as a photo lab technician; and his depression was not so severe as to impair him in any substantial way from working as a photo lab technician.  (*Id*. at 0106).

---

[20] *See also* Doc. 32 at 0679.

[21] Dr. Gerson also reviewed the May 29, 2001 VHS examination discussed above, which indicated that Smorto demonstrated tenderness to palpation in his trapezoids, latisimus dorsi, biceps, triceps and thighs, (Doc. 32 at 0103); Smorto demonstrated marked give-way weakness in all four extremities, but no true muscular weakness was noted, (*id*.); and the VHS found that Smorto's central problems were depression, sleep difficulties, pain syndrome, and muscular and low back pain, representing fibromyalgia, (*id*. at 0104).

On December 1, 2000, Dr. Michael Murphy of the VHS, found that Smorto was unable to work due to his medical problems, and determined that the disability should remain in effect until at least January 21, 2001.[22]  (*Id.* at 0751).

On December 26, 2001, Prudential denied Smorto's October 23, 2001 appeal, finding that there was no medical evidence of an impairment or combination of impairments which would prevent Smorto from working, and that all diagnostic testing had been normal (the "Third Denial").  (*Id.* at 0024-0026).

*4) Smorto's next appeal, the Social Security Administration's determination of disability, and Prudential's final denial*

Smorto appealed the Third Denial, and in doing so, submitted additional evidence including medical records and an affidavit from his father.  (*Id.* at 0597-0598).[23]  The affidavit from Smorto's father indicated that Smorto was often in bed due to pain, he did not participate in most recreational activities, he was unable to engage in any strenuous activities, he was abnormally depressed, he had difficulty traveling, and he experienced constant pain.  (*Id.* at 0599-0600).

Dr. Alyn Bennezette, a neurologist, performed a neurological evaluation of Smorto on March 12, 2002.  (*Id.* at 0366).  Dr. Benezette's evaluation noted several conditions, as follows: slight facial weakness, (*id.* at 0368); restriction of motion on all planes to a moderate degree with mild spasms and tenderness of the paraspinous muscles with multi-focal trigger points, including

---

[22] This letter does not explain the reason for Smorto's "disability," nor does it appear to have any supporting documentation.

[23] *See also* Doc. 0687-0688.

the lower cervical and upper thoracic area, (*id*. at 0367); some tenderness in the joints, (*id*.); decreased lumbar lordosis with moderate spasms and tenderness of the paraspinous muscles,[24] (*id*.); and a slight limp of the right leg, (*id*. at 0367).  Dr. Benezette's impression was that Smorto suffered from fibromyalgia.  (*Id*. at 0368).  Dr. Benezette also opined that Smorto was totally disabled at that time.[25]  (*Id*.).

On August 21, 2002, the Social Security Administration ("SSA") issued a Notice of Decision, (*id*. at 0261), which found that Smorto had impairments considered to be "severe" under the Social Security Act, including fibromyalgia, degenerative joint disease, and bi-polar disorder. (*Id*. at 0268).  The SSA also found that Smorto had the residual functional capacity to stand and walk less than two hours in an eight-hour day, to sit less than six hours, and to lift less than ten pounds.  (*Id*.).  The SSA further found that based on his functional capacity, there existed no jobs in any significant number in the economy which Smorto could perform, and thus determined that Smorto was disabled as of April 1, 2001.[26]  (*Id*. at 0269).

On July 25, 2003, Smorto submitted an activities of daily living questionnaire, which listed several medications that he had been prescribed.  (*Id*. at 0324-0331).  He also indicated the use of a cane and the occasional use of crutches for ambulation, as well as memory problems.  (*Id*. at 0325).

---

[24] Lordosis is an exaggerated forward curvature of the lumbar and cervical regions of the spinal column.  Medline Plus, *supra* at n.4.

[25] Dr. Benezette reaffirmed that opinion on July 15, 2002.  (Doc. 32 at 0365).

[26] The SSA's Notice of Decision was sent to Prudential on several occasions: once by letter dated September 26, 2002, (Doc. 32 at 0367); and at least three times in faxes dated June 25, 2003, (*id*. at 0333), August 26, 2003, (*id*. at 0306), and October 2, 2003, (*id*. at 0260).

On September 7, 2003, Dr. Amy Hopkins performed an insurance case review of all of the prior documentation,[27] (*id*. at 0086-0090), and made several findings, as follows: although Smorto used a cane and/or crutches, there was no demonstrated physical need for such devices, (*id*. at 0089); there was no record of any neurological disorder to explain Smorto's self-reported symptoms, (*id*.); Smorto's fatigue, sleep disturbances, chronic pain, trigger points and muscle aches could all be explained on a psychiatric basis without invoking fibromyalgia, (*id*.); fibromyalgia is not necessarily a disabling disorder, and many people who are diagnosed with it are able to work, (*id*. at 90); there was no objective documentation of physical impairment attributed to Smorto's largely self-reported fibromyalgia, (*id*.); there were no restrictions or limitations as of August 21, 2000, (*id*.); and Smorto had many complaints of physical conditions, but there was a lack of evidence of any objectively documented findings that supported the presence of any physical impairment that would prevent him from working without restriction or limitation as of August 21, 2000 and thereafter, (*id*.).

Prudential issued a final administrative denial of Smorto's claim on September 23, 2003, which found that medical evidence did not support Smorto's claim that he met the definition of "disability" pursuant to the Plan, and upheld its decision to terminate his benefits effective June 1, 2001 (the "Final Denial"). (*Id*. at 0043-0045).

C. The Plan

The Plan defines "disability" for the purpose of LTD coverage, as when Prudential determines that a person is "unable to perform the material and substantial duties of [the person's]

---

[27] Dr. Hopkins is board certified in internal and occupational medicine. (Doc. 32 at 0044). Dr. Hopkins did not personally examine Smorto, nor did she order any objective testing.

regular occupation due to [the person's] sickness or injury," and the person has "a 20% or more loss in [their] indexed monthly earnings due to that sickness or injury." (Doc. 29, Ex. A at 7). Further, after twenty-four months of payments, a person is "disabled when Prudential determines that due to the same sickness or injury, [the person is] unable to perform the duties of any gainful occupation for which [the person is] reasonably fitted by education, training or experience." (*Id*.). Prudential defines "material and substantial duties" as duties that are normally required for the performance of the person's regular occupation and that "cannot be reasonably omitted or modified." (*Id*.). "Gainful occupation" is defined as "an occupation, including self employment, that is or can be expected to provide [a person] with an income equal to at least the benefit percent of [their] indexed monthly earnings within 12 months of [their] return to work." (*Id*.). A person is not entitled to benefits under the Plan unless they are continually disabled through their elimination period.[28] (Id. at 8).

D. Claims and Arguments

Smorto claims that as a result of the denial of his pension benefits, he has lost benefits in an undetermined amount, and that he will continue to sustain a loss each month until such benefits are paid in full. He further alleges that the denial of these benefits was arbitrary and capricious, contrary to the documentation he presented, and inconsistent with certain definitions under the Plan. Smorto therefore seeks: (1) the entry of an order requiring the Defendants to pay him all Plan benefits due and unpaid from the date of the determination of his disability; (2) an order

---

[28] The "elimination period" is calculated as the "shorter of 90 days and the length of time for which you receive loss of time benefits, salary continuation or accumulated sick leave." (Doc. 29, Ex. A at 2). Benefits begin the day after the elimination period is completed. (*Id*.).

requiring the Defendants to designate him as an eligible participant under the Plan and to pay him a monthly pension benefit; and (3) attorney's fees pursuant to 29 U.S.C. section 1132(g)(2).

Prudential argues that this Court's review should be under the arbitrary and capricious standard, that Prudential had a reasonable basis for denying benefits, and that its decision was therefore not arbitrary and capricious.

In response, Smorto asserts that, given the nature of the medical information contained in the record, the lack of evidence as to his job description, Prudential's failure to consider a Social Security Administration determination that was favorable to him, Prudential's failure to consider his diagnosed bi-polar disorder, and Prudential's reliance on the opinions of "non-examining" physicians, Prudential's decision was arbitrary and capricious.[29]

## II.    Standard of Review

Although the parties have styled their motions in the posture of summary judgment, given the nature of challenges to benefit determinations under ERISA, Prudential's motion is more properly construed as a motion for final judgment. *Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).  In this sort of case, the Court sits in more of an appellate capacity than as a trial court, and the Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time of the decision.  *Id.* Courts in these cases generally do not take additional evidence, and thus the usual standard for

---

[29] *See* Doc. 36 at 13 ("The decision of the Defendant is clearly arbitrary and capricious, and unreasonable and for purposes of summary judgment a genuine issue of fact exists as to whether the Defendant's decision was arbitrary and capricious.").

-14-

summary judgment, such as whether genuine issues of material fact exist, does not apply.  *Id.*; *see also Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

Under 29 U.S.C. section 1132(a)(1)(B), a person may bring a civil action to recover benefits due under a plan, or to enforce rights under the terms of the plan.  29 U.S.C. 1132(a)(1)(B); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989).  The ERISA statute does not, however, provide a standard of review for actions challenging benefit eligibility determinations.  *Firestone*, 489 U.S. at 109.  The Supreme Court thus determined that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Id*. at 115.  Based on the *Firestone* language, the Eleventh Circuit has adopted three standards for reviewing administrators' plan interpretations and decisions, as follows: "(1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest."  *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997).[30]

Here, Prudential asserts that the arbitrary and capricious standard applies because the Plan vests Prudential with discretionary authority to interpret Plan provisions, determine eligibility for

---

[30] In applying the *de novo* standard, a court determines whether the plan administrator's denial decision was "wrong." *Williams v. Bellsouth Telecomm., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004). The Eleventh Circuit uses the label "wrong" "to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." *HCA Health Serv. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001).  In addition, "arbitrary and capricious" review may also be "used interchangeably with an abuse of discretion standard." *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

benefits, and to construe all Plan terms.  (Doc. 29 at 8).  A review of the language of the Plan

indicates that Prudential has such discretion.  Further, Smorto does not contest the application of

the arbitrary and capricious standard and, instead, has adopted it as the appropriate standard of

review for this Court's decision in this matter.[31]  (Doc. 36 at 11; *see also id.* at 12, 13, 15, 18).   In

addition, Smorto concedes that he does not seek review under the heightened abuse of discretion

standard.  (*Id*. at 20).  Therefore, the Court will apply the arbitrary and capricious standard in this

case.   In conducting this review, it is the Court's function to determine whether there was a

reasonable basis for Prudential's decision, based upon the facts as known by Prudential at the time

the decision was made.  *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th

Cir. 1989).

**III.    Legal Analysis**

     A. The Denials

     Prudential issued four separate denial letters in Smorto's case.  In the First Denial,

Prudential relied on medical documentation from the VHS as well as an independent examination,

and found that Smorto's neurological exam results were normal, a report from a rheumatologist

indicated that all tests were negative, Smorto had insomnia not sleep apnea, his MRI and CT scans

were negative, and all tests for his symptoms showed results within normal limits.  (Doc. 32 at

0001-0002).  Prudential determined that although Smorto may have needed to continue treatment

for his symptoms, there was no medical documentation supporting a conclusion that he was totally

---

[31] The only time Smorto even mentions *de novo* review is to request that there be a *de novo* review of the record after this Court denies Prudential's Motion on the grounds that Prudential's decision was arbitrary and capricious.  (Doc. 36 at 19).

disabled such that he was unable to perform the duties of his regular occupation.  (*Id*. at 0002).

Prudential therefore concluded that Smorto did not meet the definition of total disability under the

Plan.  (*Id*.).

      Prudential's Second Denial relied upon a review of the medical documentation in Smorto's

file, as well as additional information submitted on appeal.  (*Id*. at 0016-0017).  In reviewing that

information, Prudential found that: a September 7, 2000 exam revealed that Smorto's motor

strength measured 5/5, that he suffered no fatigue after repetitive exertion, and that his reflexes and

neurological examination were normal, (*id*. at 0017); on May 17 and 22, 2001, Smorto received

physical therapy and reported decreased pain with treatment, (*id*.); and a May 29, 2001 exam

showed that his EEG and EMG/NCS tests were normal, his neurological exam was normal, he

displayed give way weakness but no true muscular weakness, he was reluctant to give full effort

secondary to pain, he had no neurological disease, and his primary conditions were depression,

sleep difficulties, and pain syndrome, (*id*.).  After reviewing this information, Prudential

determined that: Smorto had no impairment or combination of impairments preventing him from

performing the duties of his job; although he was limited by pain, all testing and physical

examinations revealed normal findings; and his nasal congestion at night was not severe enough to

constitute an impairment that prevented him from working.  (*Id*.).

      In making the Third Denial, Prudential reviewed the medical documentation in Smorto's

file, as well as the results of the independent medical records review performed by Dr. Gerson.

(*Id*. at 0024-0025).  After reviewing Dr. Gerson's findings, Prudential determined that Smorto had

a history of psychiatric symptoms, but that there was no documentation of recently tested

intellectual impairment, concentration or attention difficulties, or severe memory impairment.  (*Id*.

at 0025).  Based on Dr. Gerson's report, Prudential also determined that there was no documentation of functional impairment from work, and that Smorto's fatigue did not appear physiologically disabling.  (*Id*.).  Prudential again concluded that Smorto had no impairment or combination of impairments preventing him from working, as all diagnostic testing was normal, he had no cognitive impairment, and his difficulties with interpersonal relations were not so severe as to prevent him from maintaining employment.  (*Id*.).

Prudential's Final Denial was based on a comprehensive review by a medical consultant (Dr. Hopkins) board certified in internal and occupational medicine.  (*Id*. at 0043-0044).  Based on that review, Prudential found: although Smorto displayed a limp, there was no actual right side weakness to account for the limp, (*id*. at 0045); the record contained numerous mentions of give way weakness and other signs of non-organic behavior, such that somatoform disorder would be a possible diagnosis to explain Smorto's reported symptoms, (*id*.); although Smorto used a cane and crutches, there was neither a documented physical need nor a medical prescription suggesting their necessity,[32] (*id*.); any diagnosis of fibromyalgia was unreliable because there was no evidence or documentation of control point testing, (*id*.); Smorto's symptoms could be explained on a psychiatric basis, (*id*.); fibromyalgia itself is not a disabling condition, increased activity levels are considered appropriate treatment, and Smorto's physicians had recommended an exercise program, (*id*.); there was no evidence of a disabling condition from either a physical or psychiatric standpoint, (*id*.); and there was neither testing nor direct observation to support the existence of

---

[32] This point is not wholly accurate.  Dr. Benezette's report recommends that Smorto use a crutch or cane for balance and support.  (Doc. 32 at 0369).

Smorto's reported cognitive complaints, (*id*.). Prudential therefore affirmed its determination that Smorto was not eligible for benefits under the Plan.

B. Whether Prudential's Decision was Arbitrary and Capricious

The Court's task is to determine whether Prudential had a reasonable basis for its denial. *See HCA Health Serv. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 994 (11th Cir. 2001). As long as Prudential's decision was reasonable, it is entitled to deference even if Smorto also advances a reasonable interpretation of the record, because the "underlying premise of arbitrary and capricious . . . review is that a court defers to the discretion afforded the claims administrator under the terms of the plan." *Id*.

Based on the facts in the record, and granting deference to Prudential's discretion, the Court cannot say that Prudential's decision was arbitrary and capricious. First, the Plan defines disability as when Prudential determines that a person is unable to perform the material and substantial duties of that person's regular occupation due to sickness or injury, and, after twenty-four months of payments, a person is disabled if Prudential determines that the person is unable, due to the same sickness or injury, to perform the duties of any gainful occupation for which the person is reasonably fitted. (Doc. 29, Ex. A at 7). The Court did not find a single medical record supporting such a definition. Although there were three reports indicating that Smorto was disabled, those reports do not appear to have examined Smorto's alleged disability vis-à-vis the material and substantial duties of his job. In addition, two of those reports only suggest a temporary disability pending further evaluation. (Doc. 32 at 0128 and 0751, reports of Drs. Black and Murphy, respectively). Further, although one report indicates that Smorto was "totally disabled" at that time, (*id*. at 0368), that opinion is based on a determination of fibromyalgia,

which determination is either not supported or criticized in other medical reports (*see id*. at 0089, report of Dr. Hopkins).

Second, the SSA finding, (*id*. at 0262) is not persuasive. Although an SSA determination of disability may be considered in reviewing a plan administrator's determination of benefits, an SSA award of benefits is not dispositive on the issue of whether a plan administrator's decision to deny benefits is to be upheld. *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1452 n.4 (11th Cir. 1997); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994).   The SSA finding was based on a determination that Smorto had several "severe" impairments under the Social Security Act, including fibromyalgia, degenerative joint disease, and bi-polar disorder, and on the determination that there were not sufficient jobs in the economy that Smorto could perform based on his functional capacity.  (Doc. 32 at 0268-0269).  Nothing in the record demonstrates the standard the SSA used in making its determination or if that standard matches Prudential's definition of disability in the Plan.  The diagnosis of fibromyalgia has been discredited in other medical reports, (*id*. at 0089, report of Dr. Hopkins), and there is no indication in the medical reports that either degenerative joint disease or bi-polar disorder render Smorto unable to perform the material and substantial duties of his job at 3DI.[33]

Finally, Prudential had all of Smorto's medical information, as well as the SSA determination, when it made the Final Denial.  The record contains letters from Prudential indicating an unwillingness to proceed with a review of Smorto's file until updated medical

---

[33] One report specifically focusing on Smorto's bi-polar disorder, from Dr. Ludvigh, discusses the difficulties Smorto may have with employment, but makes no indication that such a condition renders him unable to perform his job.  (Doc. 32 at 0616-0621).

records were received, (Doc. 32 at 0008, 0009, 0012, 0030), and thus there is no reason to believe that Prudential failed to consider any of the records in the file, including those records that appear favorable to Smorto.

Smorto urges the Court to find Prudential's decision arbitrary and capricious based on the fact that Smorto provided medical evidence of physical symptoms, Prudential's reliance on certain reports over others, and Prudential's alleged failure to consider certain diagnoses and the SSA finding.[34]   In short, Smorto seems content with repeated assertions regarding his physical and psychological limitations.  Indeed, the record contains several documents that would seem to support Smorto's claim of disability.[35]  This, however, is not the issue under review.  The question is not whether Smorto advances reasonable grounds for disagreeing with Prudential's decision, or even whether the Court agrees with that decision.  The Court's function under arbitrary and capricious review is to determine whether Prudential had a reasonable basis for its decision based on the evidence in the record.  Each denial, particularly the Final Denial, was clearly based on the

---

[34] Smorto accuses Prudential of making its decision without any evidence regarding the duties of his job.  This accusation is plainly belied by the record, which contains a fairly detailed description of a closely matched regular occupation.  *See* discussion, *supra*, at n.2; *see also* Doc. 32 at 0078.  Smorto also accuses Prudential of ignoring his diagnosis of bi-polar disorder, which assertion is also belied by the record.  The Third and Fourth Denials note that: there is no evidence of a disabling condition from either a physical *or psychiatric* standpoint," (Doc. 32 at 0045) (emphasis supplied); the records do not reveal any cognitive impairment associated with his depression, (*id*. at 0025); and his difficulty with interpersonal relationships is not so severe as to prevent him from maintaining employment, (*id*.).

[35] *See* Doc. 32 at 0128 (Dr. Black's report recommending that Smorto's temporary disability be extended pending further evaluation); *id.* at 0751 (Dr. Murphy's finding that Smorto was unable to work due to his medical problems, and recommendation that his disability remain in effect until at least January 21, 2001); *id.* at 0368 and 0365 (Dr. Benezette's opinion that Smorto was totally disabled at that time); *id.* at 0269 (SSA determination that Smorto was disabled as of April 1, 2001).

ever-accumulating medical file and on particular medical opinions synthesizing the information contained therein.  Each denial noted that there was no evidence showing that Smorto was unable to perform the duties of his job, and thus concluded that he did not meet the definition of disability under the Plan.  Therefore, even assuming that Prudential's denial was "wrong," giving deference to Prudential's discretion under the arbitrary and capricious standard of review, the Court finds that Prudential had a reasonable basis for its decision.

**IV.      Conclusion**

Prudential's decision to deny Smorto's benefits was reasonably based on evidence in the record.  Accordingly, it is

**ORDERED THAT** Prudential's Motion for Summary Judgment (Doc. 29) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants, Prudential and 3DI.  This case is removed from the August 2005 trial docket, and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 23, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party